HOLMES, Circuit Judge,
concurring.
In upholding the district court’s substantive ruling in this case, the majority concludes that Oklahoma’s same-sex marriage ban — found in SQ 711[1] — impermissibly contravenes the fundamental right to marry protected by the Due Process and Equal Protection Clauses of the Constitution. I fully agree with that conclusion and endorse without reservation the reasoning of the majority on this matter.[2]
I write here, however, to focus on one significant thing that the district court wisely did not do in rendering its substantive ruling on the same-sex marriage ban. Specifically, the district court declined to *1097 rely upon animus doctrine in striking down SQ 711. See Bishop v. U.S. ex rel. Holder, 962 F.Supp.2d 1252, 1285 n. 32 (N.D.Okla.2014). Most of the other recent judicial decisions invalidating same-sex marriage laws have exercised the same forbearance.[3] However, several district court decisions from other jurisdictions have taken a different tack and suggested that similar laws may suffer from unconstitutional animus. See Baskin v. Bogan, 12 F.Supp.3d 1144, 1163-64, 2014 WL 2884868, at *14 (S.D.Ind.2014); Henry v. Himes, — F.Supp.3d -, -, 2014 WL 1418395, at *6 (S.D.Ohio 2014); De Leon v. Perry, 975 F.Supp.2d 632, 655 (W.D.Tex.2014); Obergefell v. Wymyslo, 962 F.Supp.2d 968, 995-96 (S.D.Ohio 2013). This concurrence endeavors to clarify the relationship between animus doctrine and same-sex marriage laws and to explain why the district court made the correct decision in declining to rely upon the animus doctrine.
I will begin by setting forth the contours of the animus doctrine as those contours have been drawn by the Supreme Court’s ease law. Then, I will elucidate why SQ 711 falls outside of those boundaries and why it is consequently free from impermissible animus.
I
To understand why animus doctrine is not dispositive in this appeal, one must understand three basic features of the doctrine: (1) what is animus; (2) how is it detected; and (3) what does a court do once it is found. I will address each question in turn, before applying the answers to the case at bar.
A
Beginning with first principles, when a state law is challenged on equal-protection grounds, and when that law does not implicate a fundamental right, a federal court ordinarily decides what type of analysis to apply on the basis of what sort of characteristic the State is using to distinguish one group of citizens from another. If the law uses a suspect classification, like race, strict scrutiny applies. See Johnson v. California, 543 U.S. 499, 505-06, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005); Riddle v. Hickenlooper, 742 F.3d 922, 927 (10th Cir.2014). If the law uses a quasi-suspect classification, like gender, intermediate scrutiny applies. See United States v. Virginia, 518 U.S. 515, 532-33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir.2002). For all other classifications, rational-basis review is typically appropriate. See Armour v. City of Indianapolis, — U.S. -, 132 S.Ct.. 2073, 2079-80, 182 L.Ed.2d 998 (2012); Brown v. Montoya, 662 F.3d 1152, 1172 (10th Cir.2011).
The animus cases depart from this well-trod path. In those cases, the Supreme Court took up equal-protection challenges to government action that distinguished between people on the basis of characteristics that the Court had not deemed suspect *1098 or quasi-suspect. See Romer v. Evans, 517 U.S. 620, 624, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (describing the challenged law as classifying on the basis of sexual orientation); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 436-37, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (describing the challenged law as classifying on the basis of intellectual disability); U.S. Dep’t of Agric. v. Moreno, 413 U.S. 528, 530, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (describing the challenged law as classifying between households where the members were related to one another and households where they were not[4]); see also Massachusetts, 682 F.3d at 10 (“In [Moreno, Cleburne, and Romer], the Supreme Court has now several times struck down state or local enactments without invoking any suspect classification.”). Because the classifications at issue in the animus line of cases did not involve suspect or quasi-suspect groups, one would have expected the Court to consider the laws under conventional rational-basis review. See Armour, 132 S.Ct. at 2079-80; Brown, 662 F.3d at 1172. But that was not what happened.
In the run-of-the-mill rational-basis case, the Court asks whether the litigant challenging the state action has effectively “negative[d] ‘any reasonably conceivable state of facts that could provide a rational basis for the classification.’ ” Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (emphasis added) (quoting Heller v. Doe ex rel. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)) (internal quotation marks omitted); accord Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60, 695 F.3d 1051, 1059 (10th Cir.2012) (parroting Supreme Court precedent in noting that we must uphold a law on rational-basis review if “there is any reasonably conceivable state of facts that could provide a rational basis for [the classification]” (quoting Copelin-Brown v. N.M. State Pers. Office, 399 F.3d 1248, 1255 (10th Cir.2005)) (internal quotation marks omitted)), cert. denied, — U.S. -, 133 S.Ct. 1583, 185 L.Ed.2d 577 (2013). Defying expectations, *1099 the Supreme Court in the animus cases did not pose that broad question.
Rather than relying upon the various post-hoc rationalizations that could conceivably have justified the laws, the Court focused on the motivations that actually lay behind the laws. See Romer, 517 U.S. at 634, 116 S.Ct. 1620 (emphasizing that the challenged law was “bom of animosity toward the class of persons affected” (emphasis added)); Cleburne, 473 U.S. at 450, 105 S.Ct. 3249 (remarking that the challenged law “restfed] on an irrational prejudice against the [intellectually disabled]” (emphasis added)); Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (noting that “[t]he legislative history [of the challenged law] indicate[d] that th[e] amendment was intended to prevent so called ‘hippies’ and ‘hippie communes’ from participating in the food stamp program” (emphasis added)); see also Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 692 (6th Cir.2011) (“In each of the [animus cases], the Supreme Court ... concluded that the legislation at issue was in fact intended to further an improper government objective.” (emphasis added)).
Since the animus eases dealt with non-suspect groups, and yet did not invoke the rational-basis test in its classic form, the jurisprudence does not fit easily into the tiers of scrutiny that attach to most equal-protection claims. As a result, the type of review used in the animus decisions has been given a number of different labels. Sometimes the eases are simply lumped together with all other rational-basis cases. See, e.g., Price-Cornelison v. Brooks, 524 F.3d 1103, 1113 n. 9 (10th Cir.2008) (interpreting Romer as a rational-basis case). Sometimes the animus cases are said to apply “heightened rational-basis review,” see, e.g., Kleinsmith v. Shurtleff, 571 F.3d 1033, 1048 (10th Cir.2009), or — more colorfully — “rational basis with bite,” see, e.g., Kenji Yoshino, The New Equal Protection, 124 Harv. L.Rev. 747, 760 (2011), “rational basis with teeth,” see, e.g., Michael E. Waterstone, Disability Constitutional Law, 63 Emory L.J. 527, 540 (2014) (internal quotation marks omitted), or “rational basis plus,” see, e.g., Marcy Strauss, Reevaluating Suspect Classifications, 35 Seattle U.L.Rev. 135, 135 n.5 (2011) (internal quotation marks omitted).
For present purposes, it is of no moment what label is affixed to the distinctive equal-protection mode of analysis that is performed in the animus cases. What is important is to know when and how to conduct that analysis. As suggested above, the hallmark of animus jurisprudence is its focus on actual legislative motive. In the interest of analytical precision, it is important to clarify exactly what types of legislative motive may be equated with animus. Those motives could be viewed as falling somewhere on a continuum of hostility toward a particular group.[5] See Black’s Law Dictionary 806 (9th ed.2009) (defining “hostile,” in the relevant entry, as “[antagonistic; unfriend *1100 ly”); New Oxford American Dictionary 818 (2d ed.2005) (defining “hostile,” in the relevant entries, as “unfriendly; antagonistic,” and “opposéd”); Webster’s Third New International Dictionary 1094 (2002) (defining “hostile,” in the relevant entries, as “marked by antagonism or unfriendliness,” “marked by resistance especially] to new ideas,” and “unfavorable especially] to the new or strange”).
On the weaker end of the continuum, a legislative motive may be to simply exclude a particular group from one’s community for no reason other than an “irrational prejudice” harbored against that group. Cleburne, 473 U.S. at 450, 105 5.Ct. 3249. In this sense, animus may be present where the lawmaking authority is motivated solely by the urge to call one group “other,” to separate those persons from the rest of the community (i.e., an “us versus them” legal construct). See Romer, 517 U.S. at 635, 116 S.Ct. 1620 (invalidating “a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit”); Cleburne, 473 U.S. at 448, 105 S.Ct. 3249 (“[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the [intellectually disabled] differently from apartment houses, multiple dwellings, and the like.”); see also Bowers v. NCAA, 475 F.3d 524, 554 (3d Cir.2007) (interpreting Cleburne as prohibiting the construction of “a caste system”). On the more extreme end of the continuum, the legislative motive that implicates the animus doctrine may manifest itself in a more aggressive form — specifically, a “desire to harm a politically unpopular group.” Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (emphasis added). At either end of this continuum, and everywhere in between, at its core, legislative motivation of this sort involves hostility to a particular group and, consequently, implicates the animus doctrine.
B
Having settled the question of what constitutes animus, there remains the question of how one knows when one has found it. As explained in the following sections, the animus cases instruct us to explore challenged laws for signs that they are, as a structural matter, aberrational in a way that advantages some and disadvantages others. Two types of structural aberration are especially germane here: (1) laws that impose wide-ranging and novel deprivations upon the disfavored group; and (2) laws that stray from the historical territory of the lawmaking sovereign just to eliminate privileges that a group would otherwise receive.[6] These two rough categories *1101 of structural unusualness are neatly underscored by the Supreme Court’s two most recent statements on equal-protection law in the arena of sexual orientation: Romer and Windsor.[7] Both will be considered in detail below.
1
The first species of structural irregularity relating to the type of harm inflicted upon the injured class is powerfully captured by Romer. There, the Supreme *1102 Court struck down a Colorado constitutional amendment that prohibited all state entities from promulgating civil-rights protections specifically designated for homosexuals (or bisexuals) in any context. Romer, 517 U.S. at 635, 116 S.Ct. 1620. The Court was moved to do so by the fact that the “disadvantage imposed [was] born of animosity toward the class of persons affected.” Id. at 634, 116 S.Ct. 1620. That is to say, animus entered the stage in Romer for the principal reason that the constitutional amendment before the Court was strikingly pervasive in obstructing homosexuals from obtaining any specially designated civil-rights protections whatsoever. See id. at 627, 116 S.Ct. 1620 (“Sweeping and comprehensive is the change in legal status effected by this law.”); id. at 632, 116 S.Ct. 1620 (“[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group .... ”); id. at 633, 116 S.Ct. 1620 (“Amendment 2 ... identifies persons by a single trait and then denies them protection across the board.”). That sort of blanket burdening of a group and its rights, the Court cautioned, was unheard of and, as a consequence, inherently suspicious. See id. at 633,116 S.Ct. 1620 (“The resulting disqualification of a class of persons from the right to seek specific protection from the law is unprecedented in our jurisprudence.”); id. (“It is not within our constitutional tradition to enact laws of this sort.”). Stated differently, Romer applied the animus doctrine because a State had passed a law that pervasively constricted the rights of a group in a way that few, if any, laws had previously done. Cf. Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289, 299 (6th Cir.1997) (“[T]he Romer majority’s rejection of rational relationship assessment hinged upon the wide breadth of Colorado Amendment 2, which deprived a politically unpopular minority of the opportunity to secure special rights at every level of state law.”).
2
The second species of structural irregularity is on display in Windsor. Specifically, prior to passage of DOMA, Congress had deferred to the States’ definitional authority over marriage, an authority they enjoyed as part of their traditional police power in the domestic-relations sphere. See Windsor, 133 S.Ct. at 2691 (depicting family law as “an area that has long been regarded as a virtually exclusive province of the States” (internal quotation marks omitted)); id. (“The definition of marriage is the foundation of the State’s broader authority to regulate the subject of domestic relations.... ”); id. (“[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce.... ” (alteration in original) (internal quotation marks omitted)). DOMA represented a radical departure from that tradition, and it was that departure that brought animus concerns to the fore in Windsor:
When the State used its historic and essential authority to define the marital relation in this way, [i.e., to allow same-sex marriage,] its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community. DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage. “[Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.”
Id. at 2692 (second alteration in original) (quoting Romer, 517 U.S. at 633, 116 S.Ct. 1620) (internal quotation marks omitted). Shortly thereafter in Windsor, the Supreme Court drove the same point home:
*1103 The responsibility of the States for the regulation of domestic relations is an important indicator of the substantial societal impact the State’s classifications have in the daily lives and customs of its people. DOMA’s unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class.
Id. at 2693 (emphasis added). With these passages, the Court left no doubt that the animus doctrine was relevant to the disposition of the case because the federal government had gone beyond the federalism pale and intruded into a province historically monopolized by the States, and, what is more, that the federal government had done so solely to restrict the rights that would have otherwise been afforded to gay and lesbian individuals. See Conkle, supra, at 40 (interpreting the federalism concerns in Windsor as “directly linked to [the Court’s] animus rationale”).
C
When a litigant presents a colorable claim of animus, the judicial inquiry searches for the foregoing clues. What happens when the clues are all gathered and animus is detected? The answer is simple: the law falls. Remember that under rational-basis review, the most forgiving of equal-protection standards, a law must still have a legitimate purpose. See Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (explaining that “when conducting rational basis review we will not overturn such [government action] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government’s] actions were irrational” (alterations in original) (internal quotation marks omitted)); United States v. Angelos, 433 F.3d 738, 754 (10th Cir.2006) (“To pass muster under the rational basis test, [the statute] must have a legitimate purpose.... ” (internal quotation marks omitted)). A legislative motive qualifying as animus is never a legitimate purpose. See Romer, 517 U.S. at 632, 116 S.Ct. 1620 (“[T]he amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests.”); Cleburne, 473 U.S. at 448, 105 S.Ct. 3249 (“[M]ere negative attitudes, or fear, ... are not permissible bases for [a statutory classification].”); Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (“[The] amendment was intended to prevent socalled ‘hippies’ and ‘hippie communes’ from participating in the food stamp program,” and such “a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.”). In other words, once animus is detected, the inquiry is over: the law is unconstitutional.
This fearsome quality of animus jurisprudence has led one commentator to refer to it, most aptly, as “a doctrinal silver bullet.” Pollvogt, supra, at 889. Conversely, if animus is not properly invoked — viz., if the clues do not add up to a picture of hostile lawmaking — the analysis returns to the traditional rational-basis realm and the Court commences a more generous search for “any reasonably conceivable state of facts that could provide a rational basis for the classification.” Garrett, 531 U.S. at 367, 121 S.Ct. 955 (emphasis added) (internal quotation marks omitted); accord Ebonie S., 695 F.3d at 1059.
II
Armed with these background principles, I am now well-situated to examine how animus operates — or does not — in the context of the instant appeal.
*1104 To review, ordinarily, a law falls prey to animus only where there is structural evidence that it is aberrational, either in the sense that it targets the rights of a minority in a dangerously expansive and novel fashion, see Romer, 517 U.S. at 681-35, 116 S.Ct. 1620, or in the sense that it strays from the historical territory of the lawmaking sovereign just to eliminate privileges that a group would otherwise receive, see Windsor, 138 S.Ct. at 2689-95. The Oklahoma law at issue before us today is aberrational in neither respect. In fact, both considerations cut strongly against a finding of animus.[8]
A
To begin, SQ 711 is not nearly as far-reaching as the state constitutional amendment that Romer invalidated. The amendment taken up by Romer forbade any unit of state government from extending to gay and lesbian persons any special privileges or protections. See 517 U.S. at 624, 116 S.Ct. 1620 (reciting the language of the amendment); see also id. at 632, 116 S.Ct. 1620 (“[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group....”); id. at 633, 116 S.Ct. 1620 (“Amendment 2 ... identifies persons by a single trait and then denies them protection across the board.”). SQ 711 cannot plausibly be painted with this brush. Unlike the amendment in Romer, SQ 711 does not deprive homosexuals of civil-rights “protection across the board,” id. at 633, 116 S.Ct. 1620, in a “[sjweeping and comprehensive” fashion, id. at 627, 116 S.Ct. 1620. It excludes them from a single institution: marriage. For animus purposes, SQ 711 is an exclusion of a much different character than the Colorado amendment in Romer, which shut the door for homosexuals on myriad rights to which they might otherwise have gained access through the political process.
Furthermore, any fair historical narrative belies the theory that SQ 711 is “unprecedented in our jurisprudence.” Id. at 633, 116 S.Ct. 1620. Explicit bans on same-sex marriage are not especially venerable, but neither are they in their infan *1105 cy. See Nancy Kubasek et al., Amending the Defense of Marriage Act: A Necessary Step Toward Gaining Full Legal Rights for Same-Sex Couples, 19 Am. U.J. Gender Soc. Pol’y & L. 959, 964 n.32 (2011) (“Maryland became the first state to define marriage as between a man and a woman in 1973.... ”)•
More to the point, SQ 711 and parallel enactments have only made explicit a tacit rule that until recently had been universal and unquestioned for the entirety of our legal history as a country: that same-sex unions cannot be sanctioned as marriages by the State. See Windsor, 133 S.Ct. at 2689 (“[M]arriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.”). Even before the States made the rule explicit, marriage laws that lacked express gender limitations had the same force and effect as bans on same-sex marriage. See Dean v. District of Columbia, 653 A.2d 307, 310 (D.C.1995) (Ferren, J., concurring in part and dissenting in part, joined by Terry and Steadman, JJ.); Jones v. Hallahan, 501 S.W.2d 588, 589 (Ky.Ct.App.1973); Goodridge v. Dep’t of Pub. Health, 440 Mass. 309, 798 N.E.2d 941, 953 (2003); Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185, 186 (1971); Hernandez v. Robles, 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 6 (2006) (plurality opinion); Baker v. State, 170 Vt. 194, 744 A.2d 864, 869 (1999); see also Lewis v. Harris, 188 N.J. 415, 908 A.2d 196, 208 (2006) (“With the exception of Massachusetts, every state’s law, explicitly or implicitly, defines marriage to mean the union of a man and a woman.” (emphases added)). Far from being “unprecedented,” then, Romer, 517 U.S. at 633, 116 S.Ct. 1620, same-sex marriage bans were literally the only precedent in all fifty states until little more than a decade ago. See Michael Sant’ Ambrogio, The Extra-Legislative Veto, 102 Geo. L.J. 351, 378 (2014) (noting that Massachusetts became the first state in the country to legally acknowledge same-sex marriages in 2003); see also David B. Oppenheimer et al., Religiosity and Same-Sex Marriage in the United States and Europe, 32 Berkeley J. Int’l L. 195, 195 (2014) (“Twenty years ago, no country in the world and not a single U.S. state had authorized same-sex marriage.”). Whether right or wrong as a policy matter, or even right or wrong as a fundamental-rights matter, this ancient lineage establishes beyond peradventure that same-sex marriage bans are not qualitatively unprecedented — they are actually as deeply rooted in precedent as any rule could be.[9] *1106 See Hernandez, 821 N.Y.S.2d 770, 855 N.E.2d at 8 (“Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted. We do not so conclude.”).
A useful point of comparison in this regard can be located in the Ninth Circuit’s Proposition 8 case, which nicely demonstrates the sort of qualitatively abnormal lawmaking that triggers the animus doctrine, and nicely demonstrates the absence of any such lawmaking here.
By way of background on the Proposition 8 case, prior to the pertinent federal litigation, California had codified a statute withholding “the official designation of marriage” from same-sex couples. Perry v. Brown, 671 F.3d 1052, 1065 (9th Cir.2012), vacated on other grounds sub nom. Hollingsworth v. Perry, — U.S.-, 138 S.Ct. 2652, 186 L.Ed.2d 768 (2013). The California Supreme Court declared the statute unlawful as a violation of the state constitution. Id. at 1066. Following the court’s decision, a referendum succeeded in adding an amendment — Proposition 8— to the California Constitution defining marriage in man-woman terms, thereby nullifying the judicial ruling. Id. at 1067.
The Ninth Circuit struck down Proposition 8 on federal constitutional grounds. Id. at 1096. It began its analysis by noting that “Proposition 8 worked a singular and limited change to the California Constitution: it stripped same-sex couples of the right to have their committed relationships recognized by the State with the designation of ‘marriage,’ which the state constitution had previously guaranteed them.” Id. at 1076. In view of that effect, the Ninth Circuit posed the question presented by the appeal thusly:
[D]id the People of California have legitimate reasons for enacting a constitutional amendment that serves only to take away from same-sex couples the right to have their lifelong relationships dignified by the official status of marriage, and to compel the State and its officials and all others authorized to perform marriage ceremonies to substitute the label of domestic partnership for their relationships?
Id. at 1079 (internal quotation marks omitted). The Ninth Circuit stressed the distinction between this removal of an established right and the decision not to confer a right at all. See id. at 1079-80 (“Withdrawing from a disfavored group the right to obtain a designation with significant societal consequences is different from declining to extend that designation in the first place.... The action of changing something suggests a more deliberate purpose than does the inaction of leaving it as is.”).
With the question framed in this fashion, the Ninth Circuit determined that Proposition 8 failed constitutional scrutiny under *1107 Romer’s animus analysis. See Perry, 671 F.3d at 1081. In reaching that determination, the Perry court returned time and time again to the fact that Proposition 8 had erased a previously-existing right to marriage that had been enjoyed by same-sex couples before the ratification of the amendment. See id. (“Like Amendment 2 [in Romer], Proposition 8 has the ‘peculiar property’ of ‘withdrawing] from homosexuals, but no others,’ an existing legal right — here, access to the official designation of ‘marriage’ — that had been broadly available.... ” (second alteration in original) (emphases added) (citation omitted) (quoting Romer, 517 U.S. at 682, 116 S.Ct. 1620)); id. (“Like Amendment 2, Proposition 8 ... carves out an exception to California’s equal protection clause, by removing equal access to marriage, which gays and lesbians had previously enjoyed....” (emphasis added) (internal quotation marks omitted)); id. (“[T]he surgical precision with which [Proposition 8] excises a right belonging to gay and lesbian couples makes it even more suspect. A law that has no practical effect except to strip one group of the right to use a state-authorized and socially meaningful designation is all the more ‘unprecedented’ and ‘unusual’ than a law that imposes broader changes, and raises an even stronger ‘inference that the disadvantage imposed is born of animosity toward the class of persons affected.’ ” (emphases added) (quoting Romer, 517 U.S. at 633-34, 116 S.Ct. 1620)); id. at 1096 (“By using their initiative power to target a minority group and withdraw a right that it possessed, without a legitimate reason for doing so, the People of California violated the Equal Protection Clause.” (emphasis added)).
There is no need in the context of this case to pass upon the correctness vel non of the Ninth Circuit’s ultimate conclusion — viz., that Proposition 8 was unconstitutional under Romer. The essential point to glean from Perry is that it properly recognized the key factor that brought Proposition 8 within the realm of Romer: that Proposition 8 removed from homosexuals a right they had previously enjoyed— marriage — just as Amendment 2 did in Romer with respect to the right to secure civil-rights protections through the political process. See Romer, 517 U.S. at 632, 116 S.Ct. 1620 (“[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and ... invalid form of legislation.”). That is precisely the sort of atypical, hostile state action that exposes a law to animus analysis. And it is precisely the sort of action that is nowhere to be seen in the case before us today.
Quite unlike the California situation, it is patent and undisputed that gay and lesbian couples in Oklahoma never had the right to marry — as such couples never had the right to marry in any State that did not expressly permit them to. See Lewis, 908 A.2d at 208 (“With the exception of Massachusetts, every state’s law, explicitly or implicitly, defines marriage to mean the union of a man and a woman.” (emphases added)). The Oklahoma law effectuated no change at all to the status quo in that regard: the plaintiffs could not marry in Oklahoma before SQ 711, and they could not marry after it. A studious and conscientious reading of Romer seemingly led the Ninth Circuit in Perry to the conclusion that the deprivation of a right that would otherwise exist makes all the difference in deciding whether or not to invoke the strong medicine of the animus doctrine. Cf. Sevcik v. Sandoval, 911 F.Supp.2d 996, 1019 (D.Nev.2012) (“Because there has never been a right to same-sex marriage in Nevada, Romer and Perry are inapplicable here as to [a same-sex marriage ban].”). As noted, there was no preexisting recognized right to same-sex marriage in Oklahoma. In other *1108 words, there was no predicate right to same-sex marriage to support the Perry deprivation scenario. Thus, my examination of Perry underscores the absence here of the sort of qualitatively abnormal lawmaking that customarily triggers the animus doctrine.
In sum, for the foregoing reasons, it is patent that Romer’s animus analysis cannot support an assault on SQ 711.
B
Just like the first factor, the second factor — relating to the historical role of the lawmaking sovereign in regulating the field in question — also signals the inapplicability of the animus doctrine on these facts. As I discussed earlier, insofar as Windsor drew upon animus law, it did so because DOMA veered sharply from the deferential customs that had previously defined the contours of federal policy regarding State marriage regulations. See Part I.B.2, supra. In contrast, when the same-sex marriage provisions of a State are the subject of the challenge, those same federalism concerns found in Windsor militate powerfully in the opposite direction — viz., against an animus determination. To see why this is so, recall that in striking down the federal statute, DOMA, Windsor returned repeatedly to the fact that state legislatures are entrusted in our federalist system with drawing the boundaries of domestic-relations law — so long as those boundaries are consistent with the mandates of the federal Constitution. See 133 S.Ct. at 2691 (“State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States.” (citation omitted) (internal quotation marks omitted)); id. at 2692 (“Against this background DOMA rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next.”). But, when the subject of the challenge is a State-enacted same-sex marriage ban, those federalism interests “come into play on the other side of the board.” Id. at 2697 (Roberts, C.J., dissenting). Far from showing animus, then, Windsor’s concern with traditional federalist spheres of power is a compelling indication that SQ 711— which is a natural product of the State of Oklahoma’s sphere of regulatory concern — is not inspired by animus.
To summarize, the two factors that courts are duty-bound to consider in assaying for animus both counsel unequivocally here against an animus finding. Simply put, boiling these two factors down to their essence and applying them here, the challenged Oklahoma law does not sweep broadly — it excludes gays and lesbians from the single institution of marriage— and it cannot sensibly be depicted as “unusual” where the State was simply exercising its age-old police power to define marriage in the way that it, along with every other State, always had. See Conkle, supra, at 40 (“When the question turns from DOMA to state laws, ... there are ... reasons for avoiding animus-based reasoning. In the first place, the state-law context eliminates the federalism concern that was present in Windsor and that the Court directly linked to its animus rationale.”).
Romer and Windsor both involved extraordinarily unusual pieces of lawmaking: Romer because Colorado embedded in its constitution the deprivation of all specially designated civil-rights protections that an entire group might otherwise enjoy, and Windsor because Congress exercised federal power in a state arena for the sheer purpose of excluding a group from an institution that it otherwise had a virtually *1109 nonexistent role in defining. In stark contrast, SQ 711 formalized a definition that every State had employed for almost all of American history, and it did so in a province the States had always dominated. Consequently, SQ 711 is not plagued by impermissible animus.
Ill
For the foregoing reasons, I conclude that the district court correctly found that the animus doctrine was inapplicable here. I respectfully concur.

. Following the majority opinion, I will refer to Oklahoma’s same-sex marriage provision embodied in its constitution, Okla. Const, art. II, § 35, as "SQ 711.” Also in keeping with the majority opinion, I will refer to SQ 711’s ban on same-sex marriage as "Part A” and will refer to SQ 711’s non-recognition clause as "Part B.”

. I also fully embrace the remainder of the majority’s opinion (both its outcome and reasoning) regarding the non-recognition claim: that is, that the Barton couple lacked standing to pursue that claim and that Part B cannot be invalidated pursuant to severability law because the plaintiffs forfeited their severability argument.

. See Kitchen v. Herbert, 755 F.3d 1193, 1229-30, 2014 WL 2868044, at *32 (10th Cir.2014); Love v. Beshear, 989 F.Supp.2d 536, 547, 2014 WL 2957671, at *7 n. 14 (W.D.Ky.2014); Wolf v. Walker, 986 F.Supp.2d 982, 1017-19 (W.D.Wis.2014); Whitewood v. Wolf, 992 F.Supp.2d 410, 430-31, 2014 WL 2058105, at *15 (M.D.Pa.2014); Geiger v. Kitzhaber, 994 F.Supp.2d 1128, 1146-47, 2014 WL 2054264, at *14 (D.Or.2014); Latta v. Otter, 12 F.Supp.3d 1137, 1142-43, 2014 WL 1909999, at *28 (D.Idaho 2014); Baskin v. Bogan, 7 F.Supp.3d 759, 768-69, 2014 WL 1568884, at *3 (S.D.Ind.2014); DeBoer v. Snyder, 973 F.Supp.2d 757, 775 (E.D.Mich.2014); Tanco v. Haslam, F.Supp.2d -, -, 2014 WL 997525, at *6 (M.D.Tenn.2014); Bostic v. Rainey, 970 F.Supp.2d 456, 482 (E.D.Va.2014); Bourke v. Beshear, 996 F.Supp.2d 542, 549-52, 2014 WL 556729, at *6-7 (W.D.Ky.2014); Kitchen v. Herbert, 961 F.Supp.2d 1181, 1209-10 (D.Utah 2013), aff’d, 755 F.3d 1193, 2014 WL 2868044; Griego v. Oliver, 316 P.3d 865, 888 (N.M.2013).

. A pair of Supreme Court cases handed down a day apart in 1982 are occasionally also included in lists of the Court’s animus decisions: Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), and Zobel v. Williams, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). See, e.g., Milner v. Apfel, 148 F.3d 812, 816 (7th Cir.1998) (including Plyler and Zobel in a list of the Court’s animus cases); Susannah W. Pollvogt, Unconstitutional Animus, 81 Fordham L.Rev. 887, 899-900 (2012) (same). A careful reading of these two decisions, however, causes me to disagree with this inclusion. See Plyler, 457 U.S. at 227-30, 102 S.Ct. 2382; Zobel, 457 U.S. at 60-64, 102 S.Ct. 2309. Although Plyler and Zobel arguably undertake a slightly more penetrating analysis, rooted in the States’ arguments, than commonly found in rational-basis cases, the Court’s gaze in the two cases still extends no further than the "colorable state interests that might support” the challenged classification. Plyler, 457 U.S. at 227, 102 S.Ct. 2382 (emphases added); see Zobel, 457 U.S. at 61 & 61 n. 7, 102 S.Ct. 2309 (noting the State’s proffered “three purposes justifying the distinctions made by” the challenged classification and noting that the Court "need not speculate as to the objectives of the legislature” because they were codified in the legislation at issue). As such, Plyler and Zobel are, at the very least, more akin to the mine-run rational-basis cases than they are to the animus cases, which (as noted infra) have as their hallmark looking beyond colorable interests promoted by the challenged law into the actual motivation behind the governmental action at issue. This sui generis form of equal-protection review is absent in Plyler and Zobel; accordingly, I will not rely upon those cases in my discussion of the animus doctrine. See Massachusetts v. U.S. Dep’t of Health & Human Servs., 682 F.3d 1, 10 (1st Cir.2012) (limiting the list of the Supreme Court’s animus cases to Romer, Cleburne, and Moreno); Tiffany C. Graham, Rethinking Section Five: Deference, Direct Regulation, and Restoring Congressional Authority to Enforce the Fourteenth Amendment, 65 Rutgers L.Rev. 667, 716 (2013) (same).

. Some of the plaintiffs’ amici interpret the animus cases quite broadly, to the extent that they understand them for all intents and purposes not to involve hostility at all. See, e.g., Equality Utah Found. & Utah Pride Ctr. Br. at 10 ("While the Supreme Court has sometimes suggested that laws drawn for the purpose of disadvantaging a group are based on ‘animus,’ that term simply denotes the absence of an 'independent and legitimate’ purpose for the law, not a subjective disdain for or dislike of a particular class." (quoting Romer, 517 U.S. at 632-33, 116 S.Ct. 1620)); Joan Heifetz Hollinger et al. Br. at 4 n.8 (" ‘Animus’ as used in Romer is a term of art and does not mean subjective dislike or hostility, but simply the absence of any rational reason for excluding a particular group from protections.”). That is, in my view, simply not a plausible reading of the animus cases, which have targeted laws “bom of animosity toward the class of persons affected,” Romer, 517 U.S. at 634, 116 S.Ct. 1620 (emphasis added), and laws motivated by “a bare congressional desire to harm a politically unpopular group,” Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (emphasis added). See Pollvogt, supra, at 888 *1100 ("In short, animus, including hostility toward a particular social group, is never a valid basis for legislation or other state action.” (emphasis added)).

. It bears mention that the Supreme Court has periodically consulted legislative history materials in its search for unconstitutional animus. See United States v. Windsor, - U.S.-, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (considering a House Report in concluding that the "essence” of the Defense of Marriage Act ("DOMA”) was "interference with the equal dignity of same-sex marriages”); Moreno, 413 U.S. at 534, 93 S.Ct. 2821 (detailing legislative history to demonstrate that the challenged enactment "was intended to prevent socalled ‘hippies’ and 'hippie communes’ from participating in the food stamp program”). Notably, though, the Supreme Court has never taken into account such materials when weighing the constitutionality of a popularly-enacted law — one based upon votes directly cast by citizens— like the one before us. And it has had the opportunity to do so. Romer involved a state constitutional amendment that was passed by referendum, just as our case does. 517 U.S. at 623, 116 S.Ct. 1620. Yet the Court did not rely on campaign literature in striking down the measure, training its gaze instead on the structural attributes of the amendment that *1101 were suggestive of animus, such as its breadth and the novelty of its effects on the injured class. See id. at 626-35, 116 S.Ct. 1620. That is not surprising. The scope of a popular poll makes it difficult, if not impossible, for a court to apprehend the "intent” of individual voters from record evidence and, therefore, makes it improvident to ascribe hostility to that intent and to nullify the will of the citizenry on that basis. See Latta, — F.Supp.3d at-, 2014 WL 1909999, at *21 ("Because over 280,000 Idahoans voted for Amendment 2, it is not feasible for the Court to infer a particular purpose or intent for the provision.”); Fred O. Smith, Jr., Due Process, Republicanism, and Direct Democracy, 89 N.Y.U. L.Rev. 582, 610 (2014) ("There is a resounding absence of [a meaningful legislative] record when voters directly enact measures.”).

. Notably, the Supreme Court in Windsor did not expressly identify the tier of scrutiny that it applied in reviewing the challenged federal legislation. The extent to which Windsor is an animus case — as opposed to, most saliently here, a fundamental-rights case — is not pelluc id. Compare Windsor, 133 S.Ct. at 2692 ("Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form 'but one element in a personal bond that is more enduring.’ By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond.” (citation omitted) (quoting Lawrence v. Texas, 539 U.S. 558, 567, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003))), and id. at 2694 ("The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, and whose relationship the State has sought to dignify.” (citation omitted)), with id. at 2693 ("DOMA seeks to injure the very class New York seeks to protect.”), and id. at 2695 ("[T]he principal purpose and the necessary effect of this law are to demean those persons who Eire in a lawful same-sex marriage.”). No matter how one describes the measure of animus doctrine at work in Windsor, it cannot be seriously contended that Windsor is entirely lacking in it. In addition to the quotes recited above, Windsor spoke in manifestly animus-inflected terms when it reaffirmed that "[t]he Constitution's guarantee of equality ‘must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot’ justify disparate treatment of that group,” id. at 2693 (quoting Moreno, 413 U.S. at 534-35, 93 S.Ct. 2821), and when the Court reiterated, even more tellingly, that "[i]n determining whether a law is motivated by an improper animus or purpose, '[discriminations of an unusual character' especially require careful consideration,” id. (second alteration in original) (quoting Romer, 517 U.S. at 633, 116 S.Ct. 1620) (internal quotation marks omitted). See also William D. Araiza, After the Tiers: Windsor, Congressional Power to Enforce Equal Protection, and the Challenge of Pointillist Constitutionalism, 94 B.U. L.Rev. 367, 368 (2014) (characterizing Windsor as an animus case); Daniel O. Conkle, Evolving Values, Animus, and Same-Sex Marriage, 89 Ind. L.J. 27, 39 (2014) (“The [Windsor] Court's primary argument ... was that Congress had acted with illicit ‘animus,’ thus violating equal protection.”); Darren Lenard Hutchinson, "Not Without Political Power”: Gays and Lesbians, Equal Protection and the Suspect Class Doctrine, 65 Ala. L.Rev. 975, 977 (2014) (“[I]n Windsor, rather than considering whether gays and lesbians constitute a suspect class, the Court held simply that DOMA violates the Equal Protection Clause because it is a product of animus directed towards same-sex couples.”); cf. SmithKline Beecham Corp. v. Abbott Labs., 759 F.3d 990, 994-95, 2014 WL 2862588, at *4 (9th Cir.2014) (O'Scannlain, J., dissenting from denial of rehearing en banc) ("In declaring [DOMA § 3] to be motivated by no 'legitimate' purpose, Windsor only applies rational basis review in the same way that Romer reviewed Colorado’s Amendment 2 for rational basis.”). In the discussion that follows, I use Windsor exclusively with reference to the animus aspect of its reasoning.

. The district court found, “as a matter of law, that 'moral disapproval of same-sex marriage' existed in the public domain as at least one justification for voting in favor of SQ 711.” Bishop, 962 F.Supp.2d at 1289. In support of that finding, the district court cited statements made by several state legislators and by other supporters of the measure. Id. at 1288-89. The district court’s analysis in this regard is most naturally read as relating to its conventional rational-basis review— wherein it considered moral disapproval as one conceivable basis for the law — -not as germane to a finding of animus. See id. at 1285 n. 32 ("Because Windsor involved an unusual federal intrusion into state domestic law (not at issue here) and Romer involved an unusual, total removal of any equal protection of the law (not at issue here), the Court proceeds to conduct a more traditional equal protection analysis by determining the proper level of scrutiny and then considering all conceivable justifications for Part A.”); id. at 1288 ("The Court turns now to the conceivable justifications for Part A’s preclusion of same-sex couples from receiving an Oklahoma marriage license[, including moral disapproval].”). As noted supra, the Supreme Court has understandably (indeed, wisely) never taken into account even more formal expressions of legislative will (i.e., recorded legislative history) when weighing the constitutionality of a popularly-enacted law, like the one before us, despite having had the opportunity to do so. It seems questionable, therefore, whether it would be appropriate for a court undertaking animus review in the context of such a law to ever consider the kind of materials cited by the district court here. At any rate, even assuming that such materials are cognizable in a case like this, the few and scattered quotes referenced by the district court, as well as by the plaintiffs and some of their amici, offer far too tenuous a basis to impugn the goodwill of the roughly one million Oklahomans who voted for SQ 711. See id. at 1259 n. 1 (finding that SQ 711 was approved by a vote of 1,075,216 to 347,303).

. In an otherwise incisive opinion, the United States District Court for the Western District of Wisconsin recently analogized a same-sex marriage ban to the felled laws in Windsor and Romer, reasoning that the ban was likewise "unusual” in that it represented “a rare, if not unprecedented, act of using the [state] [constitution to restrict constitutional rights rather than expand them.” Walker, 986 F.Supp.2d at 1018 (internal quotation marks omitted). There are two problems with this argument. First, it is misleading to suggest that a ban "restricts” a substantive constitutional right that had not been recognized beforehand. Constitutional or otherwise, the plaintiffs’ rights with respect to marriage — or lack thereof — were the same before the ban as after. Second, even if it were correct to characterize the challenged laws as restrictions, they would not be restrictions of such a type as to qualify as "unusual” under Windsor and Romer. DOMA was unusual because it represented an incursion by the federal government into a province historically dominated by the States. See Windsor, 133 S.Ct. at 2691 (describing family law as "an area that has long been regarded as a virtually exclusive province of the States” (internal quotation marks omitted)); id. ("The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations ....”); id. ("[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage *1106 and divorce....” (alteration, in original) (internal quotation marks omitted)). Colorado's Amendment 2, at issue in Romer, was unusual because it cut off homosexuals’ rights in an indiscriminate fashion across numerous legal fronts. See 517 U.S. at 627, 116 S.Ct. 1620 ("Sweeping and comprehensive is the change in legal status effected by this law.”); id. at 632, 116 S.Ct. 1620 (noting that Amendment 2 had "the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and ... invalid form of legislation”); id. at 633, 116 S.Ct. 1620 (“Amendment 2 ... identifies persons by a single trait and then denies them protection across the board.”). SQ 711 is unusual in neither of these ways. It is but one piece of Oklahoma’s marriage regime, a regime our federalist system entrusts the States with maintaining, and it simply consti-tutionalizes a definition that Oklahoma has, since its creation, abided by.